## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

LUPE B. CARRASCO,

       Plaintiff,

v.                                         Civ. No. 10-0999 MCA/SMV

NEW MEXICO DEPARTMENT OF
WORKFORCE SOLUTIONS, et al.,

       Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on the Motion for Summary Judgment on All of Plaintiff's Claims and Memorandum of Law in Support Thereof ("Motion for Summary Judgment") [Doc. 64] by Defendants New Mexico Department of Workforce Solutions ("NMDWS"), State of New Mexico, Jerry Ingram, and Eddie Beagles individually and in their respective capacities as Area Director and Bureau Chief of NMDWS ("Defendants"). The Court, having considered the motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion for Summary Judgment is well taken in part and will be granted in part.

### BACKGROUND[1]

Defendant NMDWS hired Plaintiff Lupe B. Carrasco ("Plaintiff") as "Secretary, Except Legal/Medical/Executive-Operation" in its Roswell, New Mexico office effective July 14, 2008. *See* Mot. for Summ. J., Exh. A.   Plaintiff was a probationary employee for a period of one year, and as such, she was subject to suspension, demotion, or dismissal upon written notice.  *See id.*, Exh. B.   Defendant Ingram served as the Area Director of NMDWS and was Plaintiff's

---

[1] Except where otherwise noted, the following facts are undisputed.

supervisor during part of her tenure at NMDWS.   Defendant Beagles was the Assistant Bureau

Chief of NMDWS.

I.      NMDWS's Policies

When she was hired, Plaintiff received copies of various personnel policies, including the

Code of Conduct and the sexual harassment policy.   *See id.*, Exh. C.   The Code of Conduct

provides in relevant part:

> A.      As public servants, all employees are expected to maintain
> the highest standards of personal conduct at all times. . . .
>
> B.      Employees must cooperate with their supervisors, follow
> instructions and perform their work in a professional and competent
> manner.   Employees are expected to perform their work efficiently
> and to meet established Performance Appraisal and Development
> criteria.
>
> C.      Employees will maintain an attitude of courtesy and service
> to other state employees, and individuals who contact the
> Department.   Rude or unbecoming behavior towards clients,
> co-workers or supervisors will not be tolerated. . . .
>
> F.      Employees shall acquaint themselves with all Department
> policies, rules and regulations and are expected to comply with the
> same.   Failure to comply with Department policies and rules and
> regulations may result in disciplinary action, to include suspension,
> demotion or dismissal.

*Id.*, Exh. I.

The sexual harassment policy sets out the process for identifying and reporting allegations

of sexual harassment.   The policy further indicates that sexual harassment "will result in

disciplinary action, up to and including dismissal."   *Id.*, Exh. J, § IX.   The policy also provides

that "[r]etaliation is a serious violation of this policy and . . . [that] any employee found to have

retaliated against another employee for reporting sexual harassment will be subject to disciplinary

action up to and including dismissal." *Id.* § VIII.   In addition, the policy indicates that "[i]f a supervisor has knowledge of sexual harassment, and a worker does not report this conduct, the supervisor still has the affirmative duty to report it immediately to the EEO Officer." *Id.* § VI. The supervisor also has the duty to "[r]eport all allegations of sexual harassment." *Id.* § X.A.4. Furthermore, a supervisor has a duty to "[e]nsure that [a] party . . . involved in a sexual harassment complaint [is] not retaliated against," and "[a]fter a complaint of sexual harassment has been substantiated," a duty to "monitor the situation to ensure the harassment has stopped." *Id.* §§ X.A.7, X.A.8.   "Supervisors and managers who fail to take prompt and appropriate action in response to actual or alleged incidents of sexual harassment or acts of retaliation are subject to discipline, up to and including dismissal." *Id.* § IX.

II.     Allegations of Sexual Harassment Raised in the April 3, 2009, Complaint

        On April 3, 2009, Plaintiff filed a sexual harassment complaint with NMDWS's Equal Employment Opportunity Officer ("EEOO").   *See id.*, Exh. L, Attachment A.   In her complaint Plaintiff alleges that (1) in September 2008 and in December of 2008, Defendant Ingram placed his hands on Plaintiff's shoulders and caressed them; (2) in December 2008, Defendant Ingram caressed Plaintiff's shoulders, placed his face less than a foot away from her face, and said her name in a tender voice; (3) in November 2008, when Plaintiff was bending over to use the paper shredder, Defendant Ingram put his hand on the small of her back and told her to continue because he was just passing by her; (4) in September or December 2008, Defendant Ingram called Plaintiff into his office, kept her there after hours until 8:00 p.m., informed her that his wife lived out of town, and told her that if she "shared herself and opened herself" her job would get very easy; (5) at an unspecified time, Defendant Ingram came to Plaintiff's desk, told her he was going home

3

because he was not feeling well, informed her that "[i]t's hurting me here" while putting his hand

on his knee, and moved his hand slowly up to his groin while saying "[i]t also hurts me here"; and

(6) in December 2008, Defendant Ingram stood approximately three feet from Plaintiff's desk,

showed her a butcher knife, slowly twirled the knife, told Plaintiff he was going to use this knife on

people who were giving him grief and making complaints against him, and upon returning after

leaving informed Plaintiff that he was going to use the blade to slice his own throat and end his

misery. *See id*. After this last incident, Plaintiff felt "threaten[ed] and fearful." Resp. to Mot.

for Summ. J. at 30. On April 7, 2009, Plaintiff added a seventh charge of retaliation by Defendant

Ingram based upon his denial of her previously approved annual leave for April 10, 2009. *See*

Mot. for Summ. J., Exh. L, at 4. Plaintiff notified Defendant Beagles by e-mail dated April 7,

2009, that as of March 30, 2009, Defendant Ingram had approved Plaintiff's requested leave for

April 10th, but that by April 7th he had revoked that leave. *See id.*, attachments B & J.

  One of Plaintiff's witnesses, James Edwards, indicated that Defendant Ingram would

follow Plaintiff at the office, opined that this was "odd behavior that could be misconstrued," and

indicated that he had seen Defendant Ingram "yelling things at [Plaintiff]." *Id.*, Exh. L, at 8-9.

The EEOO, in his April 29, 2009, investigative conclusions, however, found that while Defendant

Ingram is "generally hyper-authoritative, intimidating and overbearing," Plaintiff's witnesses

otherwise failed to corroborate her allegations. *See id.* at 20. The EEOO concluded that

Plaintiff's first six allegations were not substantiated and that Plaintiff was not credible. *See id.* at

21. With respect to Plaintiff's seventh allegation of retaliation, the EEOO found that Defendant

Ingram's mandated appearance for his interview with the EEOO regarding Plaintiff's sexual

harassment complaint on April 6, 2009, and his denial of Plaintiff's pre-approved annual leave on

4

April 7, 2009, "[were] too proximate in time not to lead to a reasonable person to conclude that the

matters are related," and concluded that the "evidence establishes that [Ingram] did almost

immediately retaliate against [Plaintiff] for filing" her complaint.  *Id.* at 22.

Defendant NMDWS placed Defendant Ingram on indefinite administrate leave effective

during, but not after, the investigation into Plaintiff's allegations of sexual harassment and

retaliation.  *See* Mot. for Summ. J., Exh. M; *id.*, Exh. L, attachments D & E.

III.    Additional Evidence Regarding Defendant Ingram's Conduct

Plaintiff has submitted additional evidence in opposition to the Motion for Summary

Judgment that she did not provide in support of her complaint to the EEOO.  For example,

Plaintiff submits the June 6, 2012, affidavit of Delia Bailey, in which Ms. Baily states as follows:

> In September 2008[,] I personally witness[ed] Lupe Carrasco's boss
> Mr. Jerry Ingram . . . behind Lupe Carrasco having his hands on her
> shoulders and leaning close over Lupe as she sat on her chair at her
> desk.   Mr. Ingram's hands were on Lupe's shoulders, but they were
> more toward the front[] to where his fingers were touching right
> above her breasts.   I could not hear what Mr. Ingram was saying as
> he was speaking in a low voice.   Lupe quickly got up and told him
> to stop[.]   [S]he was very upset.

Aff. of D. Bailey [Doc. 71].   Ms. Bailey further indicates that on "many occasions" she

"witness[ed] Mr. Jerry Ingram follow Lupe Carrasco around the New Mexico Department of

Workforce Solutions[] building and to the parking lot" and on "several occasions" she "personally

witness[ed] Lupe kept in Mr. Jerry Ingram's office for . . . long periods of time."  *See id.*

Plaintiff also presents evidence that she informed Defendant Beagles "of the constant,

abusive, hostile and sexual behavior of Defendant Ingram of bullying and yelling in the presence

of customers at her desk and in the lobby area and hallway of her desk since August 2008 to the last

5

day of her employment." Am. Compl. ¶ 44.[2]   Moreover, Plaintiff's verified Response to the

Motion for Summary Judgment indicates that on November 21, 2008, Plaintiff filed a grievance

complaint reporting that Defendant Ingram was sexually harassing Plaintiff.   *See* Resp. to Mot.

for Summ. J. at 3, 7.   Plaintiff and Defendant Ingram attended mediation to resolve the complaint

during January or February 2009, and at the mediation, Defendant Ingram sat "less th[a]n 7 feet

away" from Plaintiff with his "legs wide open and . . . touching himself." *Id.* at 12.

Plaintiff's verified response also indicates that during or prior to December 2008

Defendant Ingram became angry at Plaintiff after she refused to have a sexual relationship with

him, and that Defendant Ingram "told [Plaintiff] as he pointed to his shredder that he could put

Plaintiff in the shredder in pieces and shred [her] to nothing." *Id.* at 26, 29-30.   Plaintiff's

response further indicates that Plaintiff "became very fearful of Defendant Ingram's statements,"

that his conduct made Plaintiff "very uncomfortable," and that she "did not like being alone [with]

Defendant Ingram but needed the job." *Id.*

IV.   Plaintiff's Job Descriptions

Prior to her termination, Plaintiff had at least three job descriptions.   Plaintiff's initial job

description for the position of "Secretary—Operational" was to "provide fast, friendly and

efficient service to incoming job customers . . . and provide secretarial support to the Area Director

and staff."   Resp. to Mot. for Summ. J., Exh. C, Doc. 68-1, p. 7.   Plaintiff's duties included

referring customers to representatives, assisting customers with job searches, distributing mail,

transferring phone calls, referring job seekers to appropriate job openings, and recording daily all

---

[2]   Although the Amended Complaint is not verified, Defendants rely on this specific allegation in
support of their Motion for Summary Judgment, *see* Mot. for Summ. J. at 9, thereby waiving any
objection to the admissibility of this evidence.

services and notes for job seekers.  *See id.*

In an e-mail dated November 8, 2008, Defendant Ingram provided Plaintiff with a slightly modified job description in which Plaintiff was to answer the phones from 8:00 a.m. to 9:00 a.m., and "provide fast, friendly and efficient service to incoming job customers visiting [NMDWS] and provide secretarial support for the Area Director, WP staff, WIA and . . . Mr. Engelhard" for the remainder of the day.  *See* Resp. to Mot. for Summ. J., Exh. G, Doc. 68-1, p. 46.   Plaintiff's duties in the latter position were the same as her duties for her previous job description.  *See id.*

Almost immediately after Plaintiff filed her April 3, 2009, complaint, Defendant Eddie Beagles gave Plaintiff four new primary job assignments and a one-page training sheet of under 80 typed words explaining how to complete the new primary job assignments.  *See* Resp. to Mot. for Summ. J. at 9-10; *id.*, Exh. O, Doc. 68-2, p. 36.   The primary job assignments were different from Plaintiff's prior job descriptions and were defined as follows:   (1) "[p]rovid[ing] quality customer service as a team member in the Welcoming Unit to business and job seekers"; (2) "provid[ing] orientation by giving to each customer . . . a brochure of the services available in the Center[,] discussing those services with the customer," taking credit in VOSS for "101 Orientation and 102 Initial Assessment," and entering a cases note in VOSS stating the services provided; (3) assuring "complete . . . customer intake and registration information is entered in the NMVOSS," taking credit in VOSS for "115 Received Services Not Classified, 149 Some Reportable Service, and 12 Use of One Stop Resource Room Equipment," and entering a case note explaining the services provided; and (4) assuring "quality referrals to needed staff assisted services and partner service, taking credit in NMVOSS for a "149 Some Reportable Service," and entering a case note explaining what services the customer needed and the reason for referral.  *See id.*

7

V.      Employee Evaluation of Plaintiff

On April 8, 2009, Defendant NMDWS performed its first Employee Evaluation of Plaintiff without any advance notice.   *See* Mot. for Summ. J., Exh. D; Resp. to Mot. for Summ. J. at 13. The Employee Evaluation was based upon the same four Primary Job Assignments Plaintiff was given just after she filed her April 3, 2009, complaint.   *Compare* Mot. for Summ. J., Exh. D. *with* Resp. to Mot. for Summ. J. at 10 *and id.*, Exh. O, Doc. 68-2, p. 38.   The Employee Evaluation lists Defendant Ingram as Plaintiff's "Supervisor," and includes a section for "Supervisor's Comments" as well as sections for comments after each rating category.   *See* Mot. for Summ. J., Exh. D.

Although Plaintiff achieved a passing score on her evaluation with respect to the performance rating categories of "Results Focus," "Customer Service," and "Quality," she did not achieve a passing score for her "Productivity/Dependability" or "Interpersonal Skills."   *Id.*   With respect to productivity, the comments indicate that Plaintiff "needs to work at a faster speed," and that "the speed at which she is working has created a bottle neck for providing needed services to customers."   *Id.*   With respect to dependability, the comments indicate that "[Plaintiff's] dependability has put me [Defendant Ingram] in an unacceptable position several times as [Plaintiff] doesn't request time off in advance as per Policy Issuance #8."   *Id.*   With respect to interpersonal skills, the comments indicate that Plaintiff needs to improve her communication and listening skills and to "establish a better work relationship with all DWS staff and partners."   *Id.*

VI.     Performance Appraisal Manual and New Mexico State Personnel Board Rules

The State of New Mexico Personnel Board has issued a user's manual to address the employee performance appraisal and development process ("Appraisal Manual").   *See* Appraisal

Manual, Resp. to Mot. for Summ. J, Exh R, Doc. 68-3, pp. 1, 4.   The Appraisal Manual, as well as State Personnel Board Rules, provide that newly-appointed employees shall receive quarterly interim reviews for the first year of appointment.   *See id.*, Doc. 68-3, p. 29; N.M. Admin. Code 1.7.9.9C.   In addition to interim reviews, Personnel Board Rules require an annual, final performance review.   *See* N.M. Admin. Code 1.7.9.9B.

The Appraisal Manual provides, "The supervisor should plan the appraisal schedule allowing enough time for all people involved to be prepared," and enough time "to implement the multi-source assessment process agreed to at the beginning of the appraisal period" and collect "performance data related to job assignments."   Appraisal Manual at 31.   Once the necessary information has been collected and evaluated, the reviewer should rate each job assignment individually and then derive a single overall job assignments rating.   *See id.* at 32.   "The individual ratings and the Final Rating are the subjective judgment of the employee's supervisor. When the total process has been used—including meetings with the employee, interim reviews, and documentation of performance—the supervisor's judgment will be supported based on a year of observation, experience, and results."   *Id.* at 31.

VII.   Plaintiff's Work Improvement Plan

Defendants offered Plaintiff a three-month work improvement plan ("Work Improvement Plan" or "WIP"), effective April 8, 2009, to July 8, 2009, which purported to help her overcome the issues noted in her negative Employee Evaluation.   *See* Mot. for Summ. J., Exh. E. Specifically, the WIP required Plaintiff to (1) attend counseling for communication skills, sexual harassment, dealing with difficult personalities, and office etiquette; (2) be courteous and professional; (3) maintain a positive working relationship with management and staff; (4) treat

co-workers with respect; (5) stop negative verbal comments; (6) abide by NMDWS policies, procedures, and assigned duties; and (7) follow the chain of command. *See id.* Plaintiff refused to sign the WIP because she did not agree with Defendant Ingram's comments in her Employee Evaluation. *See id.* It is Defendant NMDWS's policy that every employee who does not receive a passing score on an evaluation is to be offered a WIP designed to help the employee reach acceptable standards of performance. *See* Mot. for Summ. J., Exh. F. If an employee fails to comply with a WIP, that employee can be suspended, demoted, or terminated. *See id.*

VIII.   <u>Evidence of Plaintiff's Productivity and Interpersonal Skills</u>

Staff Activity Summaries indicate that Plaintiff was more productive than her co-workers between April 1, 2009, through June 1, 2009. *See* Resp. to Mot. for Summ. J, Exh. T, Doc. 68-3 ("Activity Summaries"), pp. 57, 61-63. The Activity Summaries compare Plaintiff's VOSS entries with the entries of three of her co-workers doing the same work. Specifically, the Staff Activity Summary for Plaintiff indicates that **during her six-hour day,** *see* **Resp. to Mot. for Summ. J. at 14,** Plaintiff provided 1163 individual services and entered 337 case notes, *see* Activity Summaries at 57, 61-63. In contrast, the Activity Summary for Becky Taute indicates that in her eight-hour day she provided 1580 individual services and entered 209 case notes, the Activity Summary for Magill Duran indicates that in her eight-hour day she provided 1308 individual services and entered 150 case notes, and the Activity Summary for Bill Newton indicates that in his eight-hour day he provided 1020 individual services and entered 265 case notes. *See id.*; Resp. to Mot. for Summ. J. at 14. On average, working eight hour days, five days a week, Plaintiff's co-workers provided 1303 individual services $(1580 + 1308 + 1020 = 3908 / 3 = 1303)$ and entered 208 case notes $(209 + 150 + 265 = 624 / 3 = 208)$. *See* Activity Summaries at

57, 61-63.

To provide a comparable number of services during her six-hour day, five days a week (a work day that was 75% shorter than her co-workers'), Plaintiff would be required to provide 977 individual services (1303 x .75 = 977.25) and enter 156 case notes (208 x .75 = 156). *See id.* Plaintiff's actual services provided, however, well exceeded these numbers. Specifically, Plaintiff actually provided 1163 individual services, which was well over the 977 individual services she would have to average to meet her co-workers' average productivity. *See id.* Likewise, Plaintiff actually entered 337 case notes, which more than doubled the average case note productivity of her co-workers (*i.e.*, 156 case notes). *See id.* Indeed, with respect to case notes, Plaintiff's actual raw number entered far exceeded even the highest actual raw number of case notes entered by any of her three co-workers, even without discounting Plaintiff's raw figure to account for the fact that she was working six-hour days, while her co-workers were working eight-hour days (*i.e.*, Plaintiff's raw case note total was 337, while Bill Newton had the next highest case note total of 265). *See id.*

Plaintiff also presents evidence regarding her productivity and interpersonal skills in the form of a letter of the former NMDWS Area Director Joe Sandoval dated May 13, 2012. In his letter, Mr. Sandoval indicates that he was the Area Director for the NMDWS office in Roswell prior to his retirement in August 2008, and that he had the opportunity to work with and train Plaintiff. *See* Resp. to Mot. for Summ. J, Exh. A, Doc. 68-1, p. 1. Mr. Sandoval opines that Plaintiff "is a very polite person who is self motivated and eager to learn," that Plaintiff "worked very well with all the staff and was able to adapt quickly with regards to where she was needed to help out," that she "never complained," that she "quickly learned the standard operating

11

procedures for her position as well as other duties outside her position," that she "was also able to complete the work with a high degree of quality and speed," and that she "was a valued asset to [the] team not just for her ability to learn quickly, but because she could implement what she learned and apply the new skills in helping customers who came in for assistance."  *Id.*

IX.     Plaintiff's Termination

        In an affidavit, Pauline Fuentes, a Human Resources Generalist for Defendant NMDWS, states that although Plaintiff disputed the need for WIP, Defendant NMDWS did not modify the items required by the WIP and that Plaintiff was required to comply with the WIP's terms.  *See* Mot. for Summ. J., Exh. F.   Ms. Fuentes further attests that by June 1, 2009, Plaintiff had not begun any of the items listed on her WIP, which would take several months to complete.  *See id.*

        On June 1, 2009, Defendants terminated Plaintiff on the purported ground that her job performance did not meet NMDWS standards.  *See id.*, Exh. G.   At the time of Plaintiff's dismissal, seventeen of the twenty-one employees in the office were female.  *See id.*, Exh. H.

**STANDARD**

        Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).   Under Rule 56(c), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).   Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

12

of summary judgment." *Id.* at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted). The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citation omitted). The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g., Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

Because Plaintiff proceeds pro se, the court construes her pleadings liberally and holds the pleadings to a less stringent standard than formal pleadings drafted by lawyers. *See McBride v.*

13

*Deer*, 240 F.3d 1287, 1290 (10th Cir. 2001). A plaintiff's pro se status, however, does not excuse

her from the burden of coming forward with some "specific factual support," other than

conclusory allegations, to support her claims. *See Douglass v. Gen. Motors Corp.*, 368 F. Supp.

2d 1220, 1228 (D. Kan. 2005) (citation omitted), *aff'd*, Nos. 05-3178, 05-3184, 2006 WL 1495009

(10th Cir. June 1, 2006); *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). While a

district court may make some allowances if a pro se plaintiff fails to cite proper legal authority,

confuses various legal theories, uses poor syntax and sentence construction, and is unfamiliar with

pleading requirements, "the court cannot take on the responsibility of serving as the litigant's

attorney in constructing arguments and searching the record." *Garrett v. Selby Connor Maddux*

*& Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

## DISCUSSION

Defendants move for summary judgment in their favor on all of Plaintiff's claims.[3] First,

Defendants argue that summary judgment is appropriate on Plaintiff's discriminatory discharge

claims,[4] because Plaintiff has not set forth any direct evidence of discrimination and because she

---

[3] Defendants interpret the Amended Complaint as containing three distinct claims for relief: (1) claims of employment discrimination, wrongful termination, sexual harassment, and violation of civil rights based upon the adverse employment action of Plaintiff's termination (collectively referred to herein as "discriminatory discharge claims"), (2) hostile work environment claims based on sex and race discrimination, and (3) a claim for retaliatory discharge.

[4] Defendants assume that Plaintiff's claims of employment discrimination, wrongful termination, sexual harassment, and any civil rights violations are based only upon the adverse employment action of Plaintiff's termination. Defendants therefore analyze the claims under the same framework. *See* Mot. for Summ. J. at 6-7. To the extent that Plaintiff also asserts independent claims that she was discriminated against when she was denied medical leave, quarterly reviews, a telephone at work, breaks, a filing cabinet, and/or in-house training, *see* Resp. to Mot. for Summ. J. at 2, 7, the Tenth Circuit has held that only acts that constitute a significant change in employment status, such as hiring, firing, and failing to promote, will rise to the level of an adverse employment action under Title VII. *See Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1222, 1223 (10th Cir. 2006), *cert. denied*, 549 U.S. 1252 (2007). Thus, being denied leave, reviews, a telephone, breaks, a filing cabinet, or training are not actionable under Title VII's

cannot sustain her burden under the *McDonnell Douglas* burden-shifting framework for indirect evidence by showing that she was qualified for the position held, that her discharge occurred under circumstances giving rise to an inference of discrimination, or that the proffered reason for her termination was pretextual.   Second, Defendants maintain that the Court should grant summary judgment in their favor on Plaintiff's hostile work environment claims because Defendants did not discriminate against Plaintiff on account of her sex or race and because the facts do not demonstrate that the alleged conduct was severe or pervasive.   Third, Defendants contend that summary judgment in their favor is proper on Plaintiff's claim for retaliation because Plaintiff has not identified any direct evidence of discrimination and because she cannot establish discrimination indirectly under *McDonnell Douglas* by showing a causal connection between the protected activity and her termination or by establishing that Defendants' legitimate reason for her termination was pretextual.   The Court will address each of these arguments in turn.

I.    Discriminatory Discharge Claims

Title VII of the Civil Rights Act of 1964, as amended in 1972, requires employers to make personnel decisions without discriminating against employees based on their race, color, religion, sex, or national origin.   *See* 42 U.S.C. § 2000e-2; *see also Martinez v. Barnhart*, No. 05-4170, 2006 WL 1076126, at \*2 (10th Cir. Apr. 25, 2006).   To prevail under Title VII, a plaintiff must show intentional discrimination through either direct or indirect evidence.   *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).   Defendants argue that Plaintiff has failed to satisfy her summary judgment burden of identifying facts that create a genuine dispute with respect to either method of proving intentional discrimination.

A.    Direct Evidence of Discrimination

---

anti-discrimination prohibitions.   *See id.*

Defendants first contend that Plaintiff's discriminatory discharge claims must fail because she has set forth no evidence of direct discrimination.   Under the direct approach to proving intentional discrimination, a plaintiff must "directly show that retaliatory animus played a 'motivating part' in the employment decision." *Fye v. Okla Corp. Comm'n*, 516 F.3d 1217, 1225 (10th Cir. 2008) (citation omitted).   Stated differently, "direct evidence is that which demonstrates a specific link between the alleged discriminatory animus and the challenged [employment] decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated [the employer's] decision to take the adverse employment action." *Negrete v. Maloof Distrib. LLC*, 762 F. Supp. 2d 1254, 1280 (D.N.M. 2007) (citation omitted).   If the plaintiff can establish this specific link, the burden shifts to the employer to demonstrate that it would have taken the same action irrespective of the discriminatory motive. *See Fye*, 516 F.3d at 1225.

Although Plaintiff in conclusory form indicates that she has proven discriminatory intent through both direct and indirect evidence, *see* Resp. to Mot. for Summ. J. at 20, Plaintiff does not identify which pieces of evidence provide a specific link between Defendants' alleged discriminatory animus and the employment decision to terminate her or explain how that evidence constitutes direct evidence of discrimination.   While the Court may make some allowances if a pro se plaintiff confuses legal theories or fails to cite proper legal authority, the Court cannot construct a plaintiff's arguments or search the record for direct evidence to support a plaintiff's claims. *Cf. Garrett*, 425 F.3d at 840.

Plaintiff argues in conclusory fashion that her "refusal to Defendant[] Jerry Ingram['s] sexual advances . . . caused Plaintiff[] to lose [her] employment by wrongful[] termination." *See* Resp. to Mot. for Summ. J. at 2.   Plaintiff makes no argument in her opposition to the Motion for

Summary Judgment that Defendants' race-based discrimination caused her to lose her employment.   To the extent Plaintiff contends that Defendant Ingram's sex-based conduct constitutes direct evidence of discrimination, the Court fails to see how this conduct is specifically linked to Defendants' decision to terminate Plaintiff.   Plaintiff presents evidence that between September and December 2008, Defendant Ingram caressed Plaintiff's shoulders, placed his hands on the small of Plaintiff's back while she was bending over, informed Plaintiff that his wife lived out of town and that Plaintiff's job would be easier if Plaintiff "shared" and "opened" herself, moved his hand up from his knee to his groin while telling Plaintiff that he was not feeling well because "[i]t's hurting me here," engaged in the physically threatening conduct of twirling a butcher knife three feet from Plaintiff saying that he was going to use the knife on "people" who were giving him grief and making complaints against him, and followed Plaintiff around the office and to the parking lot.   Plaintiff also presents evidence that in early 2009 Defendant Ingram sat in front of her during mediation with his legs open, touching himself, and that at an unspecified time Defendant Ingram became angry and threatened to shred Plaintiff to pieces in his shredder when she refused his sexual advances.   Without any additional evidence of a specific link between the foregoing conduct and the decision to terminate Plaintiff, the Court cannot conclude that conduct occurring as early as nine or ten months prior to Plaintiff's termination demonstrates a specific link between Defendants' alleged discriminatory animus and the decision to terminate Plaintiff many months thereafter.   The Court therefore concludes that Plaintiff has not pointed to any direct evidence of discrimination.

      B.      <u>Indirect Evidence of Discrimination</u>

If no direct evidence of discrimination exists, a court must apply the *McDonnell Douglas* burden-shifting framework to determine whether a plaintiff has set forth sufficient indirect

17

evidence of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04

(1973). To survive summary judgment under *McDonnell Douglas* in the discriminatory

discharge context, Plaintiff must establish a prima facie case of discrimination by showing that (1)

she is a member of a protected class, (2) she was qualified for the position she held, (3) she was

discharged, and (4) her discharge took place under circumstances giving rise to an inference of

discrimination. *See EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007); *Salguero v. City of

Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004). If Plaintiff establishes a prima facie case, the

burden then shifts to Defendants to articulate a legitimate nondiscriminatory reason for Plaintiff's

termination. *See id.*; *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citation omitted). If

Defendants meet their burden of production by offering a legitimate rationale in support of their

employment decision, the burden shifts back again to Plaintiff to show there is a genuine issue of

material fact as to whether the proffered reason is pretextual. *See id.* (citation omitted).

        1.    Prima Facie Case of Discrimination

            a.    Qualification for the Position Held

Defendants argue that the Court should grant summary judgment in their favor because

Plaintiff has not satisfied her prima facie burden of showing that she was qualified for the position

she held. *Cf. PVNF, LLC*, 487 F.3d at 800. Defendants contend that Plaintiff's Employee

Evaluation demonstrates that she did not meet the position's minimum standards for productivity,

dependability, and interpersonal skills. Plaintiff's Employee Evaluation indicates that Plaintiff

"needs to work at a faster speed," that "the speed at which [Plaintiff] is working has created a

bottle neck for providing needed services to customers," that "[Plaintiff's] dependability has put

[Defendant Ingram] in an unacceptable position several times," and that Plaintiff needs to improve

her communication and listening skills and to establish a better working relationships.

18

Defendants also contend that Plaintiff was not qualified for the position she held because she refused to participate in her Work Improvement Plan and it is Defendant NMDWS's policy that failure to comply with a WIP constitutes grounds for termination.

The Tenth Circuit has held that a district "court's consideration of [an employer's] nondiscriminatory reason for discharging [a plaintiff is] impermissible at the prima facie stage of the analysis." *See Bolton v. Sprint/United Mgmt. Co.*, No. 06-3042, 2007 WL 666339, at *4 (10th Cir. Mar. 6, 2007). Thus, the Court simply must determine whether Plaintiff has met her prima facie burden of establishing that she was qualified for the position held.

The Court concludes that Plaintiff has satisfied this burden. Plaintiff has presented evidence that she did not create a bottleneck for her co-workers but in fact worked at a faster speed than her counterparts. Specifically, Plaintiff's evidence demonstrates that between April 1, 2009, to June 1, 2009, Plaintiff provided 1163 individual services to customers, which far exceeded the average productivity of 977 individual services that Plaintiff's co-workers provided during this same period. Likewise, Plaintiff entered 337 case notes during this same time period (working two fewer hours per day than her co-workers), which more than doubles the average productivity of 156 case notes of her co-workers during that same period. Moreover, although the Employee Evaluation suggests that Plaintiff was not qualified for the position because her interpersonal skills were deficient, Plaintiff has produced contrary evidence from the former NMDWS Area Director indicating that Plaintiff "worked very well with all the staff and was able to adapt quickly with regards to where she was needed to help out," that she "never complained," that she "quickly learned the standard operating procedures for her position as well as other duties outside her position," that she "was also able to complete the work with a high degree of quality and speed," and that she "was a valued asset to [the NMDWS] team." Resp. to Mot. for Summ. J, Exh. A at 1.

19

The Court therefore concludes that Plaintiff has pointed to evidence sufficient to show that she was qualified for her job.

          b.      <u>Discharge Under Circumstances Giving Rise to an Inference of Discrimination</u>

Defendants also contend that Plaintiff cannot meet her prima facie burden under *McDonnell Douglas* because she cannot demonstrate that her discharge took place under circumstances giving rise to an inference of discrimination based on sex or race.   *Cf. PVNF, LLC*, 487 F.3d at 800.   Courts have enumerated a variety of circumstances that can give rise to an inference of discriminatory motive, including "preferential treatment given to employees outside the protected class, or a pattern of recommending the plaintiff for positions for which she is not qualified . . . and failure to surface plaintiff's name for positions for which she is well-qualified." *Plotke*, 405 F.3d at 1101 (internal quotation marks and citation omitted).   "A plaintiff might also rely upon the . . . timing . . . of events leading to plaintiff's termination" or upon the "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus."   *Id.* (internal quotation marks and citation omitted).

Plaintiff does not identify what specific evidence satisfies her prima facie burden of demonstrating that her discharge took place under circumstances giving rise to an inference of discrimination based on her sex or race.   Rather, with respect to her sex-based discriminatory discharge claims, Plaintiff only argues that "[her] refusal [of] Defendant[] Jerry Ingram['s] sexual advances . . . caused Plaintiff[] to lose [her] employment by wrongful[] termination."   Resp. to Mot. for Summ. J. at 2.   With respect to her race-based claim, *see* Am. Compl. ¶¶ 2, 41, Plaintiff makes no argument in her opposition to the Motion for Summary Judgment that she was discriminated against because of her race.   The Court cannot construct Plaintiff's arguments or

search the record for evidence giving rise to an inference of discrimination in order to support Plaintiff's discriminatory discharge claims.   *Cf. Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).   Thus, the Court is limited to considering whether Plaintiff's refusal to submit to Defendant Ingram's advances demonstrates that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination.

The Court notes that it already has concluded that the timing of Defendant Ingram's advances occurred as early as nine to ten months prior to Plaintiff's termination.   *See supra* § I.A. Although the timing or sequence of events leading to a plaintiff's termination may create an inference that an employee's discharge occurred under circumstances giving rise to an inference of discrimination, *see Plotke*, 405 F.3d at 1101, that inference is not created on the facts here because of the significant lapse of time between the Plaintiff's termination and the offending sexual conduct.   Because of this lapse of time, the Court is not persuaded by Plaintiff's argument that her refusal to submit to Defendant Ingram's advances resulted in her termination.   The Court therefore concludes that Plaintiff has not met her prima facie burden and grants Defendants' Motion for Summary Judgment on Plaintiff's sex-based discriminatory discharge claims.

Although Plaintiff alleges in her Amended Complaint that Defendants discriminated against her based upon her race when they denied her training that they provided to her Caucasian counterparts, *see* Am. Compl. ¶¶ 2, 41, Plaintiff makes no such argument in her opposition to the Motion for Summary Judgment, *see generally* Resp. to Mot. for Summ. J.   The Court concludes, however, that even if Plaintiff had made this contention, Defendants nonetheless would be entitled to summary judgment in their favor.   First, Plaintiff provides no evidence to support the conclusory allegation that Defendants denied her training that they granted to her Caucasian co-workers, and thus, this allegation is insufficient as a matter of law to withstand Defendants'

Motion for Summary Judgment.  *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847

F.2d 642, 649 (10th Cir. 1988).   Second, even if Plaintiff had presented evidence that Defendants

denied her training that they provided to her Caucasian co-workers, the Court would nonetheless

would grant the Motion for Summary Judgment because Plaintiff has not presented any evidence

that the alleged denial of training occurred in close temporal proximity to her termination, that the

actions or remarks made by the decision makers denying her training could be viewed as reflecting

a discriminatory animus, or that there was any link whatsoever between the alleged denial of

training and Plaintiff's subsequent discharge.   Accordingly, Plaintiff has failed to sustain her

prima facie burden of showing that her discharge occurred under circumstances giving rise to an

inference of discrimination, and the Court therefore grants Defendants' Motion for Summary

Judgment on Plaintiff's race-based discriminatory discharge claim.

        2.     Proffered Reason for Termination as Pretextual

      Defendants argue that they also are entitled to summary judgment on Plaintiff's

discriminatory discharge claims because they had a legitimate non-discriminatory reason to

terminate Plaintiff's employment, and Plaintiff has not raised a factual question with respect to

whether that reason was pretextual.   The Court, however, already has granted Defendants'

Motion for Summary Judgment on Plaintiff's discriminatory discharge claims on the ground that

Plaintiff has failed to meet her prima facie burden of showing that her discharge arose under

circumstances giving rise to an inference of discrimination.   The Court therefore need not and

does not consider Defendants' additional argument that they are entitled to summary judgment on

the claims on the ground that Plaintiff has failed to generate a factual question regarding pretext.[5]

---

[5]   The Court, however, does consider the question of pretext in addressing Defendants' Motion for
Summary Judgment on Plaintiff's retaliation claim and concludes that Plaintiff has specified facts

II.     Hostile Work Environment

Title VII's prohibition on discrimination prohibits an employer from subjecting an employee to a hostile work environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *Medina v. Income Support Div.*, 413 F.3d 1131, 1134 (10th Cir. 2005). "An individual can make a claim of sex [or race] discrimination based upon a hostile work environment" if the plaintiffs shows "(1) that she was discriminated against because of her sex [or race]; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Id.*; *see also Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009) (citations omitted). Defendants argue that Plaintiff's claims must fail because she has not pointed to facts that create a genuine dispute with respect to either of these requirements.

A.      Discrimination Based on Sex or Race

To withstand Defendants' Motion for Summary Judgment on her hostile work environment claims, Plaintiff must identify facts sufficient to create a factual dispute with respect to whether Plaintiff was discriminated against because of her sex or race. *See Medina*, 413 F.3d at 1134; *see also Bolden v. PRC Inc.*, 43 F.3d 545, 550 (10th Cir. 1994) ("[g]eneral harassment if not racial or sexual is not actionable"), *cert. denied*, 516 U.S. 826 (1995). With respect to Plaintiff's sex-based hostile work environment claim, Plaintiff's evidence indicates that on multiple occasions Defendant Ingram caressed her shoulders with his fingertips near her breasts or placed his hands on the small of Plaintiff's back as she was bending over, that Defendant Ingram informed Plaintiff that his wife lived out of town and told Plaintiff that if she "shared" and

_____

that create a genuine dispute of material fact. *See infra* § III.B.2. Thus, if the Court were to consider pretext here, the Court likewise would determine that Plaintiff had raised a genuine dispute of material fact precluding summary judgment on the discriminatory discharge claims.

23

"opened" herself her job would get very easy, and that Defendant Ingram complained of not feeling well to Plaintiff while placing his hand on his groin and saying it "hurts me here." Plaintiff also attests that during a mediation, Defendant Ingram sat with his legs open facing Plaintiff and touched himself, and that after Plaintiff refused his sexual advances he became angry and stated he could shred her to pieces in his paper shredder.   These incidents easily can be categorized as being overtly sexual and based upon Plaintiff's gender.   *Cf. Semsroth v. City of Wichita*, No. 07-3155, 2008 WL 5328466, at *14 (10th Cir. Dec. 22, 2008).   Thus, the Court concludes that Plaintiff has satisfied her summary judgment burden of creating a factual question with respect to whether Plaintiff was discriminated against based upon her gender.[6]

The Court is not persuaded otherwise by Defendants' arguments to the contrary.   Without citing any authority to support their contentions, Defendants maintain that the Court should grant their Motion for Summary Judgment on Plaintiff's gender-based hostile work environment claim because the EEOO's investigation revealed that Plaintiff's allegations could not be corroborated. *See* Mot. for Summ. J. at 13.   Defendants also contend that as of the date of Plaintiff's termination, seventeen of the twenty-one employees in the Roswell office of NMDWS office were women and none of them alleged sexual harassment or corroborated Plaintiff's claims against Defendant Ingram.[7]   *See id.*   It is not the Court's task in deciding the Motion for Summary Judgment to evaluate the credibility of Plaintiff's evidence or to otherwise determine whether that

---

[6]   In contrast, Plaintiff also argues that Defendants denied her medical leave, quarterly reviews, a telephone at work, breaks, a filing cabinet, and in-house training.   *See* Resp. to Mot. for Summ. J. at 2, 7.   The Court does not believe (and Plaintiff makes no argument indicating how) these actions were sexually motivated or otherwise based on Plaintiff's gender.   Courts have repeatedly held that "[g]eneral harassment if not racial or sexual is not actionable."   *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).

[7]   The Court notes that the affidavit of Delia Bailey does in fact corroborate Plaintiff's charges regarding Defendant Ingram's conduct.

24

evidence has been sufficiently corroborated. Rather, the Court must only determine whether Plaintiff has satisfied her summary judgment burden of "go[ing] beyond the pleadings and by [her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designat[ing] 'specific facts showing that there is a genuine issue for trial.'" *Celotex v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)). Furthermore, it matters not that seventeen of the twenty-one employees in Plaintiff's office were female, for Plaintiff's hostile work environment claim is not based upon a claim that Defendants failed to hire or employ a certain number of females in the workplace, but rather is based upon Defendant Ingram's hostile and discriminatory conduct towards Plaintiff. The Court likewise is unpersuded by the argument that none of the twenty-one employees claimed Defendant Ingram harassed them, for a sex discrimination claim does not fail simply because an employer does not discriminate against every member of the plaintiff's sex. *See Pitre v. W. Elec. Co.*, 843 F.2d 1262, 1272-73 (10th Cir. 1988).

With respect to Plaintiff's race-based hostile work environment claim, Plaintiff's sole allegation set forth only in the Amended Complaint is that Defendants denied Plaintiff, who is Hispanic, training when they failed to deny the training to other Caucasian employees. *See* Am. Compl. ¶¶ 2, 41. In response to Defendants' Motion for Summary Judgment on her race-based hostile work environment claim, Plaintiff does not support this allegation with any evidence or argument, and thus the allegation is insufficient as a matter of law to demonstrate that Defendants' conduct was motivated by or linked to Plaintiff's race. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988) (conclusory allegations will not defeat summary judgment); *see also Garrett*, 425 F.3d at 840 (the court will not construct a pro se plaintiff's arguments). Accordingly, the Court grants Defendants Motion for Summary Judgment on Plaintiff's hostile work environment claim based upon race.

25

B.    Severe or Pervasive Discrimination

To withstand Defendants' Motion for Summary Judgment on her sex-based hostile work environment claim, Plaintiff must also point to evidence that raises a genuine factual question with respect to whether the discrimination was severe or pervasive.   *Cf. Medina*, 413 F.3d at 1134.   To this end, Plaintiff is required to show more than the "ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[a] recurring point in [the Supreme Court's] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal quotation marks and citation omitted); *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012) ("Title VII does not establish 'a general civility code'" for the workplace, and "the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim") (citations omitted).   Rather, "an employer creates a hostile work environment only when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"   *Morris*, 666 F.3d at 664 (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007)).

To satisfy this standard, "a plaintiff must show that the environment was both objectively and subjectively hostile or abusive."   *Id.* (citations omitted).    The Court must assess "the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position."   *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007).   In other words, the Court must look to a "totality of the circumstances," and "consider[ ] such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

26

mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Chavez v. New Mexico*, 397 F.3d 826, 832-33 (10th Cir. 2005) (citation omitted). Furthermore, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).

Defendants contend that Plaintiff's evidence only shows that she suffered "ordinary workplace tribulations," and that she therefore has not satisfied her required showing that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment.   The Court first determines whether the alleged incidents were sufficiently "pervasive" to establish liability under Title VII. *See Morris*, 666 F.3d at 665 (conduct is actionable if it is either severe *or* pervasive).

While courts repeatedly have held that isolated comments or touching are not objectively pervasive, the evidence construed in Plaintiff's favor constitutes more than a few isolated instances of conduct.   *Compare Morris*, 666 F.3d at 665 (being hit on the head two times during a two-week period in conjunction with a few isolated slurs in light of the plaintiff's "otherwise uneventful tenure" was not sufficiently pervasive to establish a hostile work environment claim) *and Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997) ("five separate incidents of allegedly sexually-oriented, offensive comments either directed to [the plaintiff] or made in her presence in a sixteen month period" were not sufficiently pervasive to support a hostile work environment claim) *with Chavez*, 397 F.3d at 833-36 (evidence that the plaintiffs had been subjected to a "number of gender-based incidents" occurring over a long period of time, including sexual propositions, and "multiple incidents of hostile and physically threatening conduct," was sufficiently pervasive to support a hostile work environment claim) *and Harsco*

27

*Corp.*, 475 F.3d at 1184-85, 1188 ("an environment polluted with gender-specific comments and behavior that exceeded the mere flirtatiousness or baseness" was sufficiently pervasive to support a hostile work environment claim).

Specifically, Plaintiff has presented evidence that between September and December 2008 Defendant Ingram engaged in a minimum of eight sexually-based offensive and humiliating incidents including caressing Plaintiff's shoulders on four occasions (at least one time with his fingertips just over her breasts and another time with his face close to Plaintiff's while "tenderly" saying her name), placing his hands on the small of Plaintiff's back as he passed behind her while she was bending over, informing Plaintiff (whom he had kept in his office after hours) that his wife lived out of town and that Plaintiff's job would be easier if Plaintiff "shared" and "opened" herself, moving his hand up from his knee to his groin while telling Plaintiff that he was not feeling well because "[i]t's hurting me here," and threatening Plaintiff with a knife.   With respect to the last incident, the facts construed in the light most favorable to Plaintiff indicate that Plaintiff had made a complaint about Defendant Ingram's conduct prior to December 2008, that Defendant Ingram was aware of this complaint, and that December 2008 Defendant Ingram engaged in the physically threatening conduct of twirling a butcher knife three feet from Plaintiff saying that he was going to use the knife on "people" who were giving him grief and making complaints against him.   The facts further indicate that during her ten-month term of employment Defendant Ingram engaged in the "odd" conduct of following Plaintiff around the office or to the parking lot on "many" occasions, kept Plaintiff in his office for long periods of time, and yelled at Plaintiff.   The evidence also establishes that Plaintiff informed Defendant Beagles of Defendant Ingram's "constant" abusive, hostile, and sexual behavior.   Finally, the evidence construed in Plaintiff's favor indicates that Defendant Ingram touched himself inappropriately in front of Plaintiff **during**

28

a mediation session and that he became upset when she refused his sexual advances and threatened to shred Plaintiff in his paper shredder.

The Court concludes that on the facts construed in Plaintiff's favor a reasonable fact finder could objectively conclude under the totality of the circumstances that the frequency of the discriminatory conduct was sufficiently pervasive to unreasonably interfere with Plaintiff's work environment. *Cf. Morris*, 666 F.3d at 664. The Court further concludes that the facts viewed in the light most favorable to Plaintiff meet the subjective component of a hostile work environment. *Cf. id.* at 665 (citation omitted). Indeed, Ms. Bailey attested in her affidavit that Plaintiff was "very upset" after Defendant Ingram caressed Plaintiff's shoulders with his fingertips just above her breasts, and that Plaintiff stood up and told Defendant Ingram to stop. In addition, Plaintiff's verified response indicates that she felt "threatened" and "fearful" as a result of Defendant Ingram's comments, that his actions made Plaintiff feel "very uncomfortable," and that she did not like being alone with Defendant Ingram but that she needed the job.

Even if the Court had concluded that Plaintiff's claims were isolated in nature instead of pervasive, Plaintiff's hostile work environment claim might nonetheless survive if the conduct was sufficiently severe. *Cf. Morris*, 666 F.3d at 665 (citing cases). The Tenth Circuit specifically has held that isolated conduct amounting to sexual assault is objectively threatening and therefore sufficient to establish a hostile work environment claim. *See id.* at 667 (citing cases). In *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998), the Tenth Circuit concluded that a work environment was sufficiently severe and abusive where a waitress-plaintiff was subjected to the "'filthy' comments" of two customers "such as 'I would like to get into your pants'" and had her hair pulled by one customer who also "grabbed her breast, and placed his mouth on it." *Id.* at 1072. Although the evidence that Defendant Ingram caressed Plaintiff inappropriately and made

29

offensive sexual comments and gestures towards Plaintiff may not rise to the level of the sexual

assault on the *Lockard* plaintiff, the Court concludes that Plaintiff's evidence regarding Defendant

Ingram's threat towards Plaintiff that he was going to use a butcher knife on people making

complaints against him while twirling that knife in front of Plaintiff (who had at that time recently

made a complaint against him), in conjunction with Plaintiff's other evidence, was sufficiently

severe as a matter of law to constitute a hostile and abusive work environment.    The Court

further notes that its conclusion comports with Tenth Circuit authority finding conduct analogous

to the type Plaintiff alleges severe.   *Compare Lockard*, 162 F.3d at 1072 *with Morris*, 666 F.3d at

667-68 (allegations that the defendant hit the plaintiff-nurse on the head twice within a two-week

period and threw tissue from a patient's pericardium at the plaintiff in an operating room not

sufficiently severe to create an abusive work environment) *and Kline v. Utah Anti-Discrim. &

Labor Div.*, No. 10-4082, 2011 WL 1313781, *8 (10th Cir. Apr. 7, 2011) (two inappropriate

sexual comments of manager made directly to plaintiff and manager's comments to others not

directed at plaintiff containing sexual innuendo that plaintiff overheard are not sufficiently severe

to create a hostile work environment).

Drawing all reasonable inferences in favor of Plaintiff, *cf. Kaus v. Standard Ins. Co.*, 985 F.

Supp. 1277, 1281 (D. Kan. 1997), the Court concludes that a reasonable jury could determine that

Plaintiff experienced an objectively and subjectively hostile work environment due to sexual

discrimination.   *Cf. Morris*, 666 F.3d at 664.   With respect to an objectively hostile environment,

the Court concludes that under the totality of the circumstances the incidents of gender-based

conduct were sufficiently pervasive *and* severe to alter the terms and conditions of Plaintiff's

employment and to create an abusive working environment.   *Cf. id.* at 669.   With respect to a

subjectively hostile environment, the Court concludes that a reasonable fact finder could conclude

based on the evidence that Plaintiff perceived the environment to be abusive.   *Cf. id.* at 665.   The

Court therefore denies Defendants' Motion for Summary Judgment on Plaintiff's hostile work

environment claim based upon sex discrimination.[8]

III.   Retaliation

In addition to prohibiting sexual and racial discrimination and harassment, Title VII

contains an anti-retaliation provision that forbids an employer from discriminating against an

individual because she has "opposed any practice made an unlawful employment practice" by

Title VII or because she has "made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing" pursuant to Title VII.   42 U.S.C. § 2000e-3(a).   A plaintiff

bringing a retaliation claim must establish that retaliation played a part in a materially adverse

employment action and may choose to satisfy this burden by direct or indirect evidence.   *See Fye*

*v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224-25 (10th Cir. 2008).   If a plaintiff does not present

any direct evidence of retaliatory motive, the burden-shifting analysis of *McDonnell Douglas*

applies.   *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007).

Plaintiff's retaliation claim is premised on the fact that Plaintiff made a charge of sexual

harassment on April 3, 2009, pursuant to Title VII, and that after Plaintiff filed her complaint,

Defendants retaliated by giving her a negative evaluation, instituting a Work Improvement Plan,

---

[8]   Defendants also argue that Plaintiff's hostile work environment claim based upon race
discrimination must fail because Plaintiff cannot demonstrate that race-based discrimination
created a hostile or abusive work environment.   The Court already has granted Defendants'
Motion for Summary Judgment on Plaintiff's race-based hostile work environment claim on the
ground that Plaintiff failed to show that she was discriminated against because of her race.   *See*
*supra* § II.A.   The Court, however, also grants Defendants' Motion for Summary Judgment on the
race-based claim on the ground that denying training to Plaintiff is not sufficiently pervasive or
severe to alter the terms and conditions of Plaintiff's employment as a matter of law.

and subsequently terminating her employment.[9]   Defendants argue that they are entitled to

summary judgment in their favor on the retaliation claim because Plaintiff has not set forth any

direct evidence of retaliatory motive.   Defendants further contend that Plaintiff has not proven

discrimination based upon indirect evidence using the *McDonnell Douglas* burden-shifting

framework because she cannot establish a prima facie case of discrimination or demonstrate that

Defendant's legitimate, non-discriminatory reason for Plaintiff's discharge was pretextual.

A.   Direct Evidence of Retaliation

Direct evidence of retaliation "is that which demonstrates a specific link between the

alleged [retaliatory] animus and the challenged [employment] decision, sufficient to support a

finding by a reasonable fact finder that an illegitimate criterion actually motivated [the

employer's] decision to take the adverse employment action."   *Negrete v. Maloof Distrib. LLC*,

762 F. Supp. 2d 1254, 1280 (D.N.M. 2007) (citation omitted); *Twigg v. Hawker Beechcraft Corp.*,

659 F.3d 987, 998 (10th Cir. 2001) ("the plaintiff may directly show that retaliatory animus played

a motivating part in the employment decision") (internal quotation marks and citation omitted).

If the plaintiff can prove that retaliatory animus was a motivating factor, the burden shifts to the

employer to demonstrate that it would have taken the same action irrespective of the retaliatory

motive.   *See id.* (citation omitted).

Although Plaintiff contends that she has set forth direct evidence in support of her

---

[9]   While Title VII's anti-discrimination provision limits adverse employment actions to ultimate
employment decisions such as hiring, firing, or failing to promote, *see Haynes v. Level 3
Communications, LLC*, 456 F.3d 1215, 1222, 1223 (10th Cir. 2006), Title VII's anti-retaliation
provision is broader and extends beyond discriminatory actions that affect the terms and
conditions of employment, *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006).
Thus, Plaintiff's retaliation claim properly may be based upon materially adverse actions, such as a
negative evaluation or a WIP, provided a reasonable employee would consider the actions material
and adverse.   *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008).

retaliation claim, Plaintiff does not specifically identify what evidence establishes a specific link between Defendants' alleged retaliatory animus and Plaintiff's termination.   Plaintiff only argues in conclusory fashion that her Employee Evaluation and Work Improvement Plan constituted "wrongful termination, employment discrimination, retaliation, and pretext."   Resp. to Mot. for Summ. J. at 9, 11.   To the extent that Plaintiff maintains that her evaluation or WIP serve as direct evidence of discrimination, the Court rejects this argument.

Plaintiff's evidence, viewed in the light most favorable to Plaintiff, indicates that (1) her negative Employee Evaluation was false, (2) Defendants conducted the evaluation, implemented the WIP, and thereafter terminated Plaintiff in close temporal proximity to the filing of Plaintiff's complaint of sexual harassment, and (3) Defendants engaged in several procedural irregularities in conducting Plaintiff's evaluation.   The Tenth Circuit has held that while evidence of falsity, temporal proximity, or procedural irregularities may be sufficient to establish pretext under the *McDonnell Douglas* burden-shifting framework for indirect evidence, it does not constitute direct evidence that an employer was motivated by retaliatory animus.   *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001 (10th Cir. 2011).   Accordingly, Plaintiff's evidence does not establish a direct and specific link to any alleged retaliatory motive for discharging her.

"The few cases in which [the Tenth Circuit has] held that a plaintiff presented sufficient evidence to satisfy the burden of directly showing retaliatory motive" confirms the soundness of this conclusion.   *Id.*   In these cases, the evidence directly establishes the employer's unlawful animus.   *See, e.g., Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir.) (holding that the evidence directly reflected the a retaliatory motive where the plaintiff offered a termination letter in which the employer explicitly referenced the plaintiff's complaints about discriminatory pay as the reason for taking an adverse action against the employee), *cert. denied*, 528 U.S. 813

33

(1999); *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1512 (10th Cir.) (holding that the plaintiff was

entitled to a direct evidence jury instruction where he presented evidence that several people in the

promotion decision process had stated that he would not be considered for promotion because of

his discrimination complaint), *cert. denied*, 522 U.S. 1028 (1997); *Kenworthy v. Conoco, Inc.*, 979

F.2d 1462, 1471 n.5 (10th Cir. 1992) (holding that the plaintiff presented sufficient evidence to

support a finding of discrimination under the direct theory where there was testimony that a

supervisor held the plaintiff's EEOC filing against her).   The evidence in these Tenth Circuit

cases directly established animus and is different in kind from the evidence produced by Plaintiff,

which only allows the Court to infer that Defendants possessed a discriminatory motive.

      B.     <u>Indirect Evidence of Retaliation</u>

      Because Plaintiff has not set forth any direct evidence of retaliatory motive, the Court must

next determine whether Plaintiff has presented any indirect evidence under the *McDonnell*

*Douglas* burden-shifting framework.   To establish a prima facie case of retaliation under

*McDonnell Douglas*, a plaintiff must demonstrate "(1) that [she or] he engaged in protected

opposition to discrimination, (2) that a reasonable employee would have found the challenged

action materially adverse, and (3) that a causal connection existed between the protected activity

and the materially adverse action."   *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1064

(10th Cir. 2009) (citations omitted).   Under *McDonnell Douglas,* if a plaintiff can establish a

prima facie case of retaliation, the burden shifts to the defendant to show a legitimate

non-discriminatory reason for the adverse employment action.   *See Twigg*, 659 F.3d at 998

(citation omitted).   "If the defendant meets this burden, the burden shifts back to the plaintiff to

demonstrate that the defendant's proffered reason is pretext."   *Id.* (citation omitted).

      Defendants argue that Plaintiff cannot satisfy the third element of her prima facie case

because she cannot show a connection between the protected activity and her discharge. Defendants further argue that the Court should grant summary judgment in Defendants' favor because they have articulated a legitimate, nondiscriminatory reason for her termination—namely, Plaintiff's poor work performance and her failure to participate in her WIP—and Plaintiff has failed to create a genuine issue of material fact with respect to whether that reason was pretextual.

      1.    <u>Causal Connection Between a Protected Activity and a Materially Adverse Employment Action</u>

The Tenth Circuit has held that a plaintiff may meet her prima facie burden of establishing a causal connection between a protected activity and a material adverse employment action through evidence establishing temporal proximity. *See Xia v. Salazar*, No. 12-4034, 2012 WL 5909096, at \*2 (10th Cir. Nov. 27, 2012); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (a retaliatory motive may be inferred when an adverse action closely follows protected activity) (citations omitted). The Court concludes that Plaintiff has produced evidence that the materially adverse actions of her negative Employee Evaluation, her Work Improvement Plan, and her termination closely followed her protected activity of filing a sexual harassment complaint, and that this temporal proximity gives rise to a causal connection sufficient to satisfy Plaintiff's prima facie burden. *Cf. Xia*, 2012 WL 5909096, at \*2.

Specifically, Plaintiff's evidence indicates that Plaintiff filed her complaint alleging sexual harassment with the EEOO on April 3, 2009, that immediately after she filed her complaint Defendants gave Plaintiff a new job description with duties that markedly differed from her previous duties, that five days after Plaintiff filed her complaint Defendants gave Plaintiff her first Employee Evaluation on her newly-assigned job duties concluding that Plaintiff failed to achieve a passing score on certain job requirements, that Defendants gave Plaintiff this evaluation although

35

they had failed for the prior nine months to give Plaintiff any evaluation in contravention of State

Personnel Board Rules requiring quarterly interim reviews, *see* N.M. Admin. Code 1.7.9.9C, and

that eight weeks after Plaintiff filed her complaint Defendants terminated Plaintiff's employment

based upon her negative evaluation.   The Court concludes that this evidence showing the

temporal proximity of Defendants' materially adverse actions (*i.e.*, the negative evaluation, the

WIP, and the termination) satisfies Plaintiff's prima facie burden of establishing a causal

connection between a protected activity and a materially adverse employment action.   *Cf.*

*Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) ("[a] six-week period between

protected activity and adverse action may be sufficient, standing alone, to show causation, but a

three-month period, standing alone, is insufficient").

Moreover, the Court also concludes that Plaintiff's evidence that Defendant Ingram

retaliated against Plaintiff by denying her already-approved leave further establishes a causal

connection between her protected activity of filing the complaint and Defendant Ingram's

retaliatory motive in giving Plaintiff a negative evaluation.   As discussed, the EEOO specifically

determined that in response to Plaintiff's April 3, 2009, complaint of sexual discrimination,

Defendant Ingram retaliated against Plaintiff on April 7, 2009, by depriving Plaintiff of her

already-approved annual leave.   The Court concludes that this evidence of discriminatory animus

from Defendant Ingram one day prior to Defendant Ingram's negative review of Plaintiff further

establishes that the Employee Evaluation, on which Plaintiff's WIP and subsequent termination

were based, was causally connected to Plaintiff's sexual harassment complaint.   Because the

Court concludes that Plaintiff has established a causal connection, the Court denies Defendants'

Motion for Summary Judgment on Plaintiff's retaliation claim to the extent that motion rests on

Plaintiff's failure to meet her prima facie burden.

36

2.     Proffered Reason for Termination as Pretextual

Defendants argue that even if the Court concludes that Plaintiff has met her prima facie

burden under the *McDonnell Douglas* burden-shifting framework, Defendants nonetheless are

entitled to summary judgment in their favor on the ground that Defendants had a legitimate

non-discriminatory business reason to terminate Plaintiff's employment and Plaintiff has not

raised a factual question with respect to whether that reason was pretextual.

The question of pretext arises only in the third and final step of the *McDonnell Douglas*

inquiry, after a plaintiff has successfully established a prima facie case of retaliation and after an

employer has articulated a legitimate, nondiscriminatory reason for the termination.  *See Twigg*,

659 F.3d at 998 (citation omitted).   At this point, the presumption of retaliation created by the

plaintiff's prima facie case "simply drops out of the picture," *St. Mary's Honor Ctr. v. Hicks*, 509

U.S. 502, 511 (1993), and "[t]he plaintiff then carries the full burden of persuasion to show that the

defendant [retaliated] on [an] illegal basis." *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114,

1125 (10th Cir. 2005).   Since a plaintiff utilizing the *McDonnell Douglas* framework normally

cannot provide direct evidence of retaliation, "a pretext argument provides a method of satisfying

this burden by allowing the fact finder 'to infer the ultimate fact of [retaliation] from the falsity of

the employer's explanation." *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160,

1167 (10th Cir. 2007) (internal quotation marks and citation omitted).

A plaintiff shows pretext by demonstrating "weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable fact finder could rationally find . . . unworthy of credence" and hence infer that the

employer did not act for the asserted nonretaliatory reasons. *Plotke v. White*, 405 F.3d 1092, 1102

(10th Cir. 2005) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997)).   Evidence

of pretext may take a variety of forms, and "[a plaintiff] may not be forced to pursue any particular means of demonstrating that [a defendant's] stated reasons are pretextual." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 1230 (10th Cir. 2000) (citation omitted).

There are, however, a few typical methods for a plaintiff to prove pretext. For example, a plaintiff may provide evidence that the defendant's stated reason for an adverse employment action was false. *See id.* In other words, "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a [retaliatory] purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *see also Twigg*, 659 F.3d at 1001. In addition, a plaintiff may prove pretext using evidence establishing the temporal proximity between a complaint about discrimination and a subsequent adverse employment action, because such proximity may justify an inference of retaliation. *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004); *Twigg*, 659 F.3d at 1001. A plaintiff may also show pretext by establishing that the defendant deviated from normal company procedure, for deviation evidence can "'permit[] a reasonable inference that [the employer] acted with an ulterior motive and . . . engineered and manufactured the reasons [it] proffered for terminating [the employee's] employment.'" *Twigg*, 659 F.3d at 1003 (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1138 n.11 (10th Cir. 2003)).

Defendants argue, and the Court agrees, that they have articulated a legitimate, non-discriminatory reason for Plaintiff's discharge. Specifically, Defendants maintain that they terminated Plaintiff because she did not meet minimum standards for productivity, dependability, and interpersonal skills as reflected on her Employee Evaluation, and because Plaintiff failed to comply with the terms of her Work Improvement Plan instituted as a result of her negative evaluation, which is a ground for termination. Because Defendants have satisfied their burden

under the *McDonnell Douglas* framework, the burden shifts back to Plaintiff to show that Defendants' proffered reason for her termination was pretextual.

The Court concludes that Plaintiff has pointed to sufficient evidence to create a genuine dispute of material fact with respect to whether Defendants' stated reason for her discharge was pretextual. *Cf. Plotke*, 405 F.3d at 1102 (citation omitted); *Reeves*, 530 U.S. at 147; *Twigg*, 659 F.3d at 1001. As previously discussed, Plaintiff has presented evidence that Plaintiff was in fact more productive than her co-workers and that she had good interpersonal skills. *See supra* § I.B.1.a. This evidence creates a factual dispute with respect to whether Defendants' proffered reason for Plaintiff's termination was false, thus allowing a reasonable fact finder to infer the ultimate fact of retaliation from the falsity of Defendants' explanation. *Cf. Swackhammer*, 493 F.3d at 1167. Furthermore, Plaintiff has presented evidence that the WIP Defendants implemented failed to address Plaintiff's allegedly deficient productivity, which, construing the facts in the light most favorable to Plaintiff, suggests that Defendants proffered reason for implementing the WIP and terminating Plaintiff was false.

In addition, Plaintiff has presented temporal-proximity evidence, which the Tenth Circuit has held may also establish that an employer's proffered reason for an adverse employment action is pretextual. *Cf. Annett*, 371 F.3d at 1240. As the Court already has noted, Plaintiff's evidence indicates that Plaintiff filed her complaint with the EEOO on April 3, 2009, and that immediately thereafter Defendants gave Plaintiff a new job description with markedly different duties, five days thereafter Defendants gave Plaintiff a long-overdue Employee Evaluation on her newly-assigned job duties concluding that Plaintiff failed to achieve a passing score on certain job requirements, five days thereafter Defendants created a WIP for Plaintiff to address the alleged deficiencies on Plaintiff's evaluation, and approximately eight weeks later Defendant terminated

39

Plaintiff's employment based on Plaintiff's negative Employee Evaluation and her refusal to complete the tasks on her WIP. This evidence establishing the temporal proximity of Defendants' materially adverse actions to Plaintiff's filing of a sexual harassment complaint with the EEOO raises an inference from which a reasonable fact finder could conclude that Defendants' proffered reason for Plaintiff's termination was pretextual. *See id.*

Plaintiff also has presented evidence that Defendants deviated from their normal company procedures, which further supports Plaintiff's argument of pretext. Tenth Circuit has determined that "disturbing procedural irregularities" can raise an inference of pretext. *Cf. Doebele*, 342 F.3d at 1138 n.11. Specifically, Plaintiff's evidence demonstrates that Defendants failed to give Plaintiff an interim review during her first nine months of employment despite a State Personnel Board Rule and an employment policy that require employers to give probationary employees such as Plaintiff an interim review four times during her first year of employment, *see* N.M. Admin. Code 1.7.9.9C; Appraisal Manual at 29, and that Plaintiff unexpectedly received her long-overdue first interim review five days after filing her sexual harassment complaint.

Moreover, Plaintiff has presented evidence that Defendants substantially changed Plaintiff's a job description immediately after she filed her April 3, 2009, complaint, that the only instruction Plaintiff received regarding her new and markedly different job duties was an 80-word instruction sheet, and that five days after changing her duties Defendants chose to evaluate Plaintiff's performance with respect to the new duties. Defendants undertook these actions despite the fact that the Appraisal Manual provides that a supervisor should plan the appraisal schedule in advance "for all people involved to be prepared," "to implement the multi-source assessment process agreed to at the beginning of the appraisal period," and to collect performance data related to the job assignments being reviewed, so that the supervisor's judgment will be

40

"supported based on a year [or, in the case of an interim review, a quarter] of observation, experience, and results." *Id.* at 31.   Plaintiff's evidence thus demonstrates that Defendants deviated from this normal company policy during their evaluation of Plaintiff.

Plaintiff also presents evidence that Defendants deviated from their sexual harassment policy.   The evidence construed in Plaintiff's favor indicates that even though the EEOO specifically found that Defendant Ingram retaliated against Plaintiff and Defendant Beagles was aware of this retaliation as early as April 7, 2009, Defendants took no action to discipline Defendant Ingram, despite the fact that the sexual harassment policy explicitly states that any employee found to have retaliated against another employee for reporting sexual harassment "will" be subject to disciplinary action.[10]   *See* Mot. for Summ. J., Exh. J, § VIII.   Moreover, although the evidence revels that Defendant Beagles was aware of Defendant Ingram's retaliatory actions as early as April 7, 2009, one day prior to Plaintiff's April 8, 2009, Employee Evaluation, there is no evidence in the record that Defendant Beagles monitored the situation or took any action to protect Plaintiff from further retaliation as required by the sexual harassment policy.   *See id.* §§ X.A.7, X.A.8.   To the contrary, Defendants allowed Defendant Ingram to conduct Plaintiff's Employee Evaluation on April 8, 2009, thereby providing Defendant Ingram with an opportunity to further retaliate against Plaintiff rather than protecting Plaintiff from additional retaliation.   Furthermore, although the sexual harassment policy also provides that a supervisor is subject to discipline if he fails to take prompt action in response to actual or alleged retaliation, *see*

---

[10]   To the extent Defendants argue that they did take disciplinary action against Defendant Ingram by placing him on administrative leave pending the investigation into Plaintiff's complaint, the Court is not persuaded.   Placing Defendant Ingram on administrative leave while awaiting the resolution of Plaintiff's complaint is not the equivalent of disciplining Defendant Ingram pursuant to the sexual harassment policy based upon a sustained finding of the EEOO that Defendant Ingram retaliated against Plaintiff.

*id.* § IX, the facts construed in Plaintiff's favor indicate Defendant Beagles was not subject to any discipline for failing to take prompt action in response to Defendant Ingram's retaliation against Plaintiff, despite the fact that he was aware of the retaliation as early as April 7, 2009.

The foregoing evidence of Defendants' deviations from their internal policies and from State Personnel Board Rules creates a factual question from which a reasonable fact finder could infer the ultimate fact of retaliation from the falsity of the employer's explanation.  *Cf. Swackhammer*, 493 F.3d at 1167.   Because Plaintiff has pointed to falsity, temporal-proximity, and deviation evidence sufficient to create a genuine dispute of material fact with respect to the question whether Defendants' proffered reason for her discharge was pretextual, the Court denies Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim.

## CONCLUSION

IT THEREFORE HEREBY  ORDERED that Defendants' Motion for Summary Judgment on All of Plaintiff's Claims and Memorandum of Law in Support Thereof [Doc. 64] is hereby GRANTED IN PART and DENIED IN PART as follows:

(1)    Defendants' Motion for Summary Judgment on Plaintiff's sex- and race-based discriminatory discharge claims is GRANTED;

(2)    Defendants' Motion for Summary Judgment on Plaintiff's hostile work environment claim based upon sex discrimination is DENIED, and Defendants' Motion for Summary Judgment on Plaintiff's hostile work environment claim based upon race discrimination is GRANTED; and

(3)    Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim is DENIED.

SO ORDERED this 30th day of March, 2013.

M. CHRISTINA ARMIJO
Chief United States District Judge